AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Caroline Prescott, | ) | Case No. |
| | ) | |
| | ) | 3:19-71420 |
| | ) | |
| Defendant(s) | ) | |

~~UNDER SEAL~~

FILED AUG 30 2019 SUSAN Y. SOONG CLERK, U.S. DISTRICT COURT NORTH DISTRICT OF CALIFORNIA

JCS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___September 14, 2018___ in the county of ___San Francisco___ in the ___Northern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: _____

WILLIAM FRENTZEN
Assistant United States Attorney

_____
Complainant's signature

Janette Spring, Special Agent - FBI
Printed name and title

Sworn to before me and signed in my presence.

Date: __9/30/2019__

_____
Judge's signature

City and state: ___San Francisco, California___    Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for CAROLINE FATAFEHI PRESCOTT ("PRESCOTT"), also known as CAROLINE STEVENS and CAROLINE PRESCOTT-CLARK.

2. There is probable cause to believe PRESCOTT, while employed as a Marketing Director for an assisted living facility in Hayward, California, accepted kickback payments in exchange for anticipated patients she would refer from the facility, in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI cooperating witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE").

4. An identified co-conspirator informed the investigation that PRESCOTT was a physician willing to accept kickbacks in exchange for patient referrals.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

5. During the course of the investigation, the UCE held in-person audio and video recorded conversations with PRESCOTT in 2018 in which PRESCOTT received kickback payments in exchange her agreement to send patient referrals to HHA Alpha.

### B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

6. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

14. PRESCOTT, is a 53 year old female believed to reside in San Ramon, California and was the Marketing Director for Landmark Villa in Hayward, California.

15. While employed at Landmark Villa, PRESCOTT accepted kickback payments in the form of cash from UCE as a retainer for anticipated referrals of home health and/or hospice patients to

an HHA UCE was going to purchase.

### E. STATUTE VIOLATED

16. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly, or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. PRESCOTT IS INTRODUCED TO UCE AND CW-1

17. Through CW-1's position at HHA Alpha, CW-1 became familiar with YI WEN SHIH, also known as NICOLE SUNO ("SUNO"). SUNO was a marketer for Asian American Home Care, Inc. ("ASIAN AMERICAN"), a home health care agency located in Alameda, California. During the UCO, SUNO was identified as a healthcare professional willing to accept kickbacks in exchange for patient referrals.

18. On September 14, 2018, UCE met with SUNO and PRESCOTT in Hayward, California. This meeting was audio recorded. During the meeting, SUNO introduced PRESCOTT to UCE in effort to recruit her to the patient referral kickback scheme. PRESCOTT was the Marketing Director for an assisted living facility in Hayward, California, a facility which, according to SUNO, had "a lot of patients".

19. Prior to PRESCOTT's arrival to the meeting, SUNO indicated PRESCOTT "also calls out to do marketing and then she would make request. Like say, I want my patient to use this only hospice [company], this home health [company]." UCE asked SUNO "Okay, alright, perfect. Do you, do you know what her normal rate is or should I not talk about that with her?" SUNO responded that UCE could talk to PRESCOTT openly and that PRESCOTT "likes people who pay fast." UCE told SUNO "Okay, well um yeah as long as, I mean basically what I do is if you think this will work out with her is that she promises that she'll work with us. I'll give her a retainer [kickback payment for future patient referrals] right now just to say thank you for signing up [committing to future patient referrals]." SUNO

reassured UCE and stated "Yeah. I know she will work with you guys."

20. Once PRESCOTT joined the meeting, UCE asked her if SUNO explained the kickback scheme to which PRESCOTT responded "Some." UCE proceeded to tell PRESCOTT about the business plan and patient referral kickback scheme. The following is an excerpt of PRESCOTT agreeing to participate in the scheme by sending patient referrals to UCE in the future, once UCE took over the company:

> UCE: Okay. Um so uh if you're willing to work with us [send patient referrals] we have, we'd be happy to thank you [pay a kickback] in person.
>
> PRESCOTT: Uh huh.
>
> UCE: Uh what-what I can do if you're okay with it is I can thank you [pay a kickback] a little bit today and just-just for agreeing to work with us in the future.
>
> PRESCOTT: Okay.
>
> UCE: And then just to wait with us until we officially get onboard [buy the HHA].
>
> PRESCOTT: Okay, and this is home health?
>
> UCE: Home health and hospice.
>
> . . .
>
> UCE: We would never ask you for an exclusive relationship. Um, clearly, you know Medicare pays the best but we also know that there's mixtures of things and so sometimes you need other-other people taken care of and if we're making our money on Medicare [Medicare patients] we can occasionally take other things [other health insurances], mix it in because again if there are certain companies that demand every single one of your Medicare patients have to go to us

> because we're thanking [paying kickbacks] you and again, another thing. You might as well put a red flag and send it up.

SUNO: Yeah, that's true.

. . .

UCE: I mean, I understand, you know, thanking [paying] people but you, as you understand you have to be careful about that and you can, you can get in a lot of trouble for that and so we do not wanna put people in the position where people are gonna start to wonder is that person being thanked [paid kickbacks] on the side.

SUNO: Uh huh.

UCE: And that's not, that's not what we want so if you ever feel like we're asking you to do something that is, that's going to attract unnecessary attention, feel free to, to, I'll come down we'll talk face to face.

PRESCOTT: Oh definitely.

UCE: We'll resolve it. Right, but don't be, don't be shy about that. Don't be shy about that because…

PRESCOTT: Oh, I'm, I'm not. Trust me.

UCE: Um there's a, I used to do work in South Carolina and uh there's a, a good phrase down there. They said pigs get fed. Hogs get slaughtered. It's okay to be a little greedy but don't be really, really greedy.

PRESCOTT: Right.

UCE: Because then you're gonna get slaughtered.

PRESCOTT: Right, right.

## B. PRESCOTT ACCEPTS KICKBACK PAYMENTS FOR FUTURE PATIENT REFERRALS

21. During the same meeting, UCE and PRESCOTT proceeded to discuss kickback compensation amounts for future patient referrals. PRESCOTT requested $700 per patient referral. As a retainer for future patient referrals, UCE offered: "If you are okay, just for, if you agree with working with us in the future, this is a thousand dollars, just to say thank you for now." PRESCOTT accepted the $1,000 kickback payment for future patient referrals and once again, agreed to accept future kickback payments in the amount of $700 per patient referral.

22. On October 4, 2018, PRESCOTT sent a text message to UCE, inquiring about the status of a "start date". UCE responded, "I am on vacation. Can we chat next week when I am back?" to which PRESCOTT responded "Ok". The following week, UCE updated PRESCOTT that UCE still did not have an answer.

23. On October 24, 2018, UCE met with SUNO and discussed the business take over was still delayed. SUNO indicated PRESCOTT was "saving patients for [UCE]". UCE gave SUNO an envelope containing $1,000 in cash to be paid to PRESCOTT for future patient referrals. UCE told SUNO "I'll give you this [envelope of $1,000 in cash] if you wanna give it to her that's fine. I brought it here instead of me taking a separate trip. You wanna give it to her, that's fine." SUNO took the payment and advised "Okay, I'll give it to her."

24. On October 31, 2018, PRESCOTT left a voicemail for UCE. PRESCOTT used coded language to thank UCE for the $1,000 in cash which UCE had given to SUNO on October 24, 2018, to give to PRESCOTT. PRESCOTT said, "Thank you for my beautiful necklace of a thousand beads that Nicole had delivered to me yesterday." UCE followed up with PRESCOTT on the same day via text message and stated "Glad you enjoyed the necklace [$1,000] [emoji] and thanks for being patient with us until we can get our real business started.]" PRESCOTT responded "How can I not be patient when you spoil me with beautiful jewelry [money]".

25. During the course of the UCO, PRESCOTT met with UCE on one occasion, during which she accepted cash for future referrals of Medicare patients to UCE. Additionally, PRESCOTT accepted cash through SUNO from UCE. In total, PRESCOTT accepted $2,000 in cash from UCE and in exchange, committed to send patient referrals to UCE in the future.

### C. PRESCOTT ADMITS TO ACCEPTING KICKBACK PAYMENTS IN EXCHANGE FOR PATIENT REFERRALS

26. On January 16, 2019, PRESCOTT was interviewed by Special Agents of the FBI. This interview was audio recorded. PRESCOTT stated she was employed by Landmark Villa and it was her role to market their services to families as well as manage home health care referrals. PRESCOTT admitted to receiving cash kickback payments for the referral of patients to AMITY for the past three years. PRESCOTT indicated these payments were always in cash and were for approximately $500 per patient referral. PRESCOTT also admitted to receiving $1,000 in cash kickback payment from SUNO which she acknowledged was actually from UCE.

## III. PROBABLE CAUSE FOR THE VIOLATION

### A. TITLE 42 UNITED STATES CODE, SECTION 1320a-7b(b)(1)(A), THE ANTI-KICK BACK STATUTE

27. Title 42, United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

28. Based on all of the foregoing, probable cause exists to believe that PRESCOTT accepted kickback payments from UCE that were intended to induce PRESCOTT to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

29. Medicare is a federally funded health care program, and the referral of patients to an HHA by PRESCOTT for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

30. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by PRESCOTT in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV. CONCLUSION

31. Based on the foregoing, there is probable cause to believe PRESCOTT accepted kickback payments in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

## V. REQUEST FOR SEALING

32. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 30th day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge